We'll hear argument next in New York Pet Welfare Association vs. the City of New York, 15-4-1-3. We'll hear argument next in New York Pet Welfare Association vs. the City of New York, 15-4-1-3. Your Honor, it's Jeff Pollack, Box Rothschild here on behalf of the New York Pet Welfare Association. This statute is the kind of blatant local protectionist legislation that the Commerce Clause has struck down repeatedly. We have three arguments, the Commerce Clause, federal preemption, and state preemption. With your permission, I'll address the issues in that order. The very goal of the Commerce Clause, as the Court well knows, is to protect competition in the marketplace. That's what it's designed to do. It's designed to avoid parochial interest, and that's exactly what this legislation does. The favored New York retail rescue entities, as we call them, you can call them shelter and rescue facilities, have amassed over $330 million in profits. If you want the citations, they're in the records. The CEOs of these entities are making hundreds of thousands of dollars. There is no doubt that this is absolutely commerce. The core question I think that the Court may have up front, and obviously I'm here to answer your questions, is are these the same dogs? And I think that's almost the right question. The question, according to the Supreme Court, is not whether they're the same dogs, but do they compete in the same marketplace? If we look at Pike, for example, one of the key cases in this area, the California melons were of superior quality, and they were competing with the Arizona melons. Arctic Maid was a case with Alaska salmon, where they looked at and compared the different salmon qualities. GM and Tracy Hunt, Washington apples versus North Carolina apples. In each case, what the Court cited, and this is Hunt at 432-333, the citations are in our brief. The central question the Court asked is not whether the source was the same, but whether they were competing in the same marketplace. And on this record, it is absolutely conceded by my adversary that they are competing in the same marketplace. Animal Care and Control is run by Risa Weinstock, who is the CEO of Animal Care and Control. That's S.A. Special Appendix 344. Each one of these people, she says in her own language, this is the adoptive agent of my adversary, says that the Class A's and Class B's, and I'll explain that in one second, that are competing with the pet rescues and shelters are her competition. The very word that she uses, competition. And that's exactly what the Commerce Clause is designed to promote, not prevent. Are some of your members in state that is within your seat? Yeah. Can I explain it this way, Judge? Who is the New York Pet Welfare Association? And I know you know the Commerce Clause better than I ever will. I apologize for that. I'll do the best I can. But who are our members? We start with Class A's. They're people raising puppies in different places. Then you have exempt breeders, and they're, if you will, smaller than, less than 25 dogs. You then have, under the USDA standard If you are a Class A licensee, am I wrong or am I right that you, even if you're out of state, you can get blocked by this legislation at all? In fact, you are likely to make money. I think that's wrong, Your Honor. Why is that wrong? What part of that is wrong? The law is crafted so that it's facially neutral. Class B's in New York are treated the same as Class B's out of state. That's their argument. You're going to hear that in a minute. Class A's out of state are treated just like Class A's in New York. The problem is, on this factual record, it is wrong. The federal structure is that Class A's and exempts, and if you don't mind, I'll treat those together because they're kind of the same concept, raising puppies more or less. They cannot avail themselves of the New York market without the Class B's. The very purpose of the Class B's is to identify the reasonable and responsible breeders, to bring them safely, because they have special vehicles for doing so, and bring them to the market where they're going to be wanted. The record in this case is that several people tried as Class A's, Your Honor, to address your question directly, and actually wanted to say, let's cut out the middleman. We'll try and avoid the Class B's. They couldn't do it. So on this record, on the evidence before you, the Class A's cannot avail themselves. When you say the record and the evidence, was this not a motion to dismiss? It was. I'm citing to the appellate record, Your Honor. You're right. There was no factual finding. There was no evidence heard. So since all inferences are drawn against the moving party, I hope I used the right phrase, I'm citing to the record that we currently have. But the Class A's, to address your question, in theory only, if you're in Oklahoma and you're selling a dog for $1,500, it's going to cost you $800 to fly over here to New York City. You've got to spay $300 or $400 at night. You can no longer make any profit on that dog, right? You've just eaten the entire profit. Class A's tried it and it failed. And there's two people, and it's in our verified complaint, and it's also in attached verifications, that they simply could not avail themselves of the New York market. This also, by the way, is the federal structure. The USDA has set up a structure. Class A's and exempts are people who are allowed to raise dogs. They are licensed. They are inspected. And they're subject to the state jurisdiction in which they are located. On this record, critically, there are no Class B's in New York. Now, technically, you'll hear in a minute, but there's four Class B's. Well, three of them are no longer operational. And the last one, it's unclear whether they never sold a dog in New York. So the evidence here is that every Class B is out of state. That's exactly why I think if you look at Carbone, it's not facially invalid because I have to look at the statute and say Class A's and Class B's are being treated alike. But wouldn't that be the consequence of the rule that you're objecting to? I mean, if Class B's are not allowed to perform functions in New York, this is not a hospitable climate for Class B's. Well, it's clearly not hospitable. They've outlawed them completely, pet stores. Isn't that the explanation of why Class B's aren't in New York? Because they're prohibited from operating. Right, but, Your Honor, I'm trying to answer your question. I hope I am. Yes, the law absolutely says Class B's are unable to function in New York City. SPA, special appendix, page 88, can't sell any Class B dogs. What's interesting is— But can't they—I'm sorry. You answer that question, and I'll follow up. Go ahead. But that's exactly what we're challenging. Because the problem is that the federal structure says there's a reason for this. Class A's cannot—to answer your question, Judge—cannot avail themselves of the market without Class B's. So the only way Class A's and Class B's can function is together. They work together. When you get to Class B's being in New York City, the Class B's want to be able to compete with the mass— According to the North Shore Animal League, over 1 million dogs over the last 30 years. They're spending millions of dollars to import dogs into New York City. Those dogs are like the apples from Washington State and North Carolina, the melons from California. Is there another forum, or are there other fora in New York State that's available to Class B licensees to sell dogs? I believe there are, Your Honor, but New York City— So your problem is that they're prevented from selling them in pet stores? In New York City in particular. In New York City, according to their evidence, this is— Shoot, I'm sorry. They'll come to me one second. But one of their own agents identified that it was the—caps—was the largest single market in the United States. So it is critical—the New York market is critical, and that is essential. I haven't even gotten to the preemption clause, but that is essential to the marketplace, Your Honor. May I address—I know my time has expired. Can I briefly address federal— Mostly the federal preemption. Okay. On federal preemption, the federal statute—this statute says, as Your Honor points out, no Class B's. That's exactly what the federal structure provides, is Class B's and Class A's are both defined, and they have the right to function and operate. The most they'll be able to argue is the quote-unquote savings clause. This is that the regulation is at 2143. It's Special Appendix 131. The problem is that does not apply because this is not a police health and safety issue. The minnow case, Maine v. Taylor, the idea of Maine was prevent disease-ridden minnows from coming into Maine and attacking the Maine lobsters. In this case, the record is that they're bringing in thousands and thousands, and they're spending millions to bring in rescues and shelters for the favorite New York entities. They are not allowing us to compete in the marketplace and bring in dogs, which is exactly—they're shipping in dogs. That's what Class B's do. They're selling dogs for a profit, and they're profiting at every step. They're profiting with spaying and neutering and veterinary services. All the things that pet stores do, they're doing, and they're profiting from every bit of it. This is not a health and safety issue because, in Maine, they wanted to protect the in-state dogs, right, the in-state minnows. In this case, they're bringing in all kinds of dogs, and the evidence that we have from Dr. Honig and others is that the worst dogs, meaning—and I don't mean bad dogs, but dogs with the most disease-ridden—are the ones they're bringing in. So it's not the case, and by the way, our dogs, there's no evidence on the record, and in fact, CAPS also indicated that none of our dogs, purebred dogs, are the ones adding to the kennel problem. For most of the dogs, 80 to 90 percent, according to Risa Weinstock, are pit bulls. The last issue, if I may blatantly violate my time, Your Honor, is estate preemption, which I think is a critical issue here. In estate preemption, when a veterinarian takes a license in New York State, they have to swear an oath, and that oath says, I will get informed consent, and no, they don't ask the dog. They have to ask the dog's owner. They have to use their best independent professional judgment as to what they're going to do, and the science of today is that there is a significant and real question whether early spaying and neutering is good or actually fail for the dog. Expert after expert has certified and verified this record, but did testify before the City Council, as veterinarians, that they thought this was a bad law, that spaying and neutering before six months, before a year, was potentially to lead to early dog deaths and cancer. Thank you very much, Mr. Pollack. Yes, Your Honor. I reserve two minutes of rebuttal. Thank you, Judge. Good morning, Your Honors, and may it please the Court. Ben Wellickson on behalf of the City of New York, the New York City Council, individual council members Corey Johnson and Elizabeth Crowley. Now, I'd like to start with the Dormant Commerce Clause, because I think it was the issue that was most discussed by my colleague, and the first point I'd like to make is that as my time concedes, this statute treats Class A and Class B dealers exactly the same. Both in- and out-of-state dealers are subject to the exact same regulations, and so there is clearly no interstate commerce clause problem as a result. Now, the burden that they object to is a burden with respect to pet stores versus animal shelters, and that is an entirely intrastate burden. New York City pet stores are subject to burdens because they are targeted by a sourcing statute. New York City animal shelters are not, but nor are out-of-state animal shelters either, and so the burden, again, here is entirely one of interstate, and there is simply no problem with a regulator targeting two interstate entities and treating them differently, especially here where it is- Male Speaker You could shut down all the pet stores in New York City and prefer some other set of stores, so long as it's in New York City. Ben Wellickson I do believe, actually, that is true, Your Honor. A regulator could target a particular business and find that it is not appropriate for its jurisdiction. That's clearly not what's going on here. However, that would not offend the Dormant Commerce Clause. Indeed, I think what is crucial here is the fact that this burden on Class A breeders that my colleague has identified is one that is shared both in and out-of-state, and so there is nothing under the Dormant Commerce Clause that causes a problem where a regulator imposes a regulation that requires a business to change its method of operation, which is exactly what's going on here. Male Speaker Is there any other locality that has a similar set of laws, you know, the pet shop laws? Ben Wellickson As our adversaries pointed out in their brief, there are numerous jurisdictions that have imposed similar restrictions, not exactly like the ones that we have here, but I'm aware that, for example, there's a law in New Jersey that's requiring that pet stores must only source their pets from animal shelters. Chicago has a similar regulation as well, and the city has gone less far than that and simply requires that pet stores directly engage in face-to-face transaction with Class A breeders. And so, again, there is no Dormant Commerce Clause problem because all actors are treated similarly, and the only burden falls entirely intrastate. Indeed, it makes no sense to require the same sourcing provision on animal shelters because they simply are not the same actors as pet stores. Animal shelters function to take in animals from all locations who are sick or abandoned or stray to provide medical care for them and to hopefully find them adoptive homes. They're simply not the same actor as a pet store, and that's clearly why they are treated differently here. Isn't it perfectly possible for the same commerce to take place but simply requiring either a pet store or a breeder to hire personnel who would be working for them, who would perform the function that would otherwise have been performed by a Class B? That's precisely correct, Your Honor. There's nothing stopping a Class A breeder from, for example, raising the initial price that they charged for selling a pet to take into account the new distribution regulation burden that are required by the statute to raise that price and to impose the price exactly on New York City consumers as a result of the New York City law. That is exactly the mechanism that this Court identified in cases such as Sorrel and Brown and Williamson v. Tobacco, where a regulation merely required an entity to change its business model, perhaps raise its price, and as a result, it does not offend the Commerce Clause as a result. But it's able to do the business. Correct. It's able to do the business. As a matter of logical economic supply and demand, it can simply raise its price, change its business model, and sell directly in New York City pet stores. Does it necessarily have to raise its price to do that? I mean, if it increases its revenues by taking on additional personnel to perform that function, it wouldn't even need to raise prices. That's right. It may be that it's more efficient to do so, and it may be that Class A breeders who are able to change their distribution model and adapt flexibly to this regulation will see an increase in business. And indeed, as a result, there's no impeding of the commerce that's flowing interstate, because the same amount of dogs and cats are flowing interstate. It's simply the method of operation of the business that's regulated that has changed. And for this reason as well, because plaintiffs have identified no either discriminatory impact or disparate impact on interstate commerce, the PIKE analysis simply does not apply. PIKE requires a qualitative or quantitative difference with respect to burdens on interstate versus interstate commerce, and that simply does not apply here. But even if it did, we think we would clearly succeed even on this procedural posture. And this is because the central challenge that plaintiffs have lodged against this regulation is based in their empirical and their disagreement with the legislator's empirical and predictive judgments. They don't believe that this law is necessary. They don't believe that this law is going to impact or affect in the way that the city council desires. They made those very same arguments during the legislative process that brought these laws into effect, and their disagreement with the empirical judgments that the city council made, which are based in an extensive record, do not provide a basis to invalidate the law. Now, I'd like to turn to the preemption argument as well. Here again, there is no problem whatsoever. And that is because the Animal Welfare Act explicitly contemplates that localities and states enact regulations of this kind. When the AWA was first enacted, Section 24, Congress was aware that states and localities had, as a matter of traditional local authority, regulated animal welfare within their jurisdiction. And as a result, when Congress enacted the AWA, it specifically authorized and indeed encouraged federal authorities to, quote, cooperate with state and local authorities in implementing both the AWA and municipal ordinances on the, quote, same subject. That is a clear and unmistakable intention not to preempt. Congress was aware that this is an area of traditional local concern, and it explicitly disclaimed any desire to preempt the field or to expressly preempt these regulations. Now, nor has plaintiffs identified any conflict between the statutes. Class A and Class B brokers can continue to sell to consumers directly. They simply can't sell at pet stores, and they can comply with the federal statute and the state statute at the same time. Nor is there any need for some sort of national authority. Their argument is that somehow or other the licensing established by the AWA over Class B somehow gives them federal authorization or guarantees them the right to function in that capacity. Right. And that clearly is not a proper interpretation of how preemption works. First of all, the mere fact that the federal government has dined to license and regulate a particular sector of the market does not mean that as a result of that license, they are given a carte blanche authority to do what they will, especially given a statute that contemplates local regulation of this kind. And cases such as the Florida blood plasma case, which we cited in our brief, in which blood plasma centers were regulated by the FDA, indeed were licensed by the FDA, but were provided with additional regulations by a Florida locality, made the very same argument that by virtue of their federal license, they had the right to do exactly what they wanted to do. You overstate your position a little bit in talking about carte blanche authority to do whatever they will. They're not saying they should be entitled to carte blanche authority. They're saying that the inference to be drawn from the federal statute is that they're entitled to function, not necessarily to do anything they want to do. That may be, but they're not prevented entirely from functioning. They simply cannot engage in a particular transaction with a particular counterparty here, the pet shops. However, they can still continue to sell directly to consumers, and as we point to in our brief, there are websites that provide them with the opportunity to do so, and they do continue to do so. And finally, with respect to state preemption, just briefly. Are there any Class B licensees currently operating in New York? I believe that the record indicates that they are operating. I'm not sure offhand what has taken place since. At the time that this lawsuit was initiated, the law hadn't gone to an effect, so I don't know if there's been any effect as a result of that. Does it matter? You say that they are permitted to do certain things. They're simply not permitted to do others. But would it matter to your argument if the effect of the New York law was simply to say, no, they can't function in New York? It would not for purposes of preemption as long as Class B licensees can comply with both state and federal law, and it would not as a matter of the Dormant Commerce Clause because it does not offend the Dormant Commerce Clause to shift the market from one interstate actor to another. Your position is that the decision of the federal government to subject them to licensing for purposes of facilitating controlling what they do does not in any sense imply that the federal government is guaranteeing them any right to operate. It certainly does not, especially when the statute specifically states in 2143A8 that localities may adopt regulations that are stricter to and in addition to those regulations that are adopted by the Secretary of Agriculture here. With the Court's indulgence just to briefly touch on the state preemption claim here, I think it's quite clearly untenable. Emphasis on the word briefly, yes. It's quite clearly untenable, Your Honor, simply because the state legislature specifically enacted the Puppy Mill Bill in 2013 with the express and explicit intention of permitting localities to adopt span-neuter laws of the kind that are challenged here, and we think that clearly dispels any state preemption challenge in this case. Thank you very much. Thank you. Mr. Spaulding. SBA 131 is the federal regulation that they're citing, too, for the savings clause. It is limited. It is limited because when you look at SBA 132, it says the only place where the state governments are allowed to enroll is the place you would naturally think so, not health and safety, and they can promulgate standards to govern humane handling, care, treatment, transportation. Not one word there, not one section here, no part of it says you cannot – the state governments say you can't sell dogs. Now, can a city or state say no dogs at all? Yes, but New York has not said that, so the section they're relying upon simply is inapplicable. It doesn't govern it, and that gets to the commerce clause. When you step back for a second, our argument really is pretty simple. New York is favoring local entities who are profiting in the neighbor of millions, 300-plus million dollars. They are charging at every aspect of it, of neutering, spaying, veterinary services, importation, sale, everything, and they are excluding a competing entity. This is precisely what the commerce clause is not allowed to do. There is no public health and safety concern because our dogs are not ending up with the government. It's creating some business pressure on those other entities, but it's not excluding them. Class Bs, SPA, 88, are expressly prohibited from bringing dogs into New York City for sale. They can't do it, right? They can't sell a New York City dog. And the factual record here, if we're looking at weighing, is whether the – this is – every case, we look at the factual record. The fact is Class As here on this record say we cannot avail ourselves of the market. And the last issue I'll end up with is the state commerce clause is really pretty simple. When a veterinary takes that oath, they take the oath that they're going to give the best service they can to that dog in their own independent judgment. New York law does not allow them to exercise that independent judgment. New York City is completely violating New York state law because with the veterinarian, if you're the one actually taking care of that dog, you have to say, do I think, do I, Jeff Pollack, the veterinarian, think it is proper that I should spay and neuter a four- or five- or six-month-old dog? They say, well, the only other option – It doesn't compel any veterinarian to spay any dog. That's true. I can hold onto the dog. But then Dr. Katz says that ain't good for the dog either. The probability of relinquishment, of the dog being returned for behavioral problems because it is now bonded with the pet store or the class A who is not designed to do it, that's also on the record, also fails. So you're putting that veterinarian who has to do the spaying and neutering in a horrible choice. The choice is do the spaying and neutering, which I know will lead to early dog deaths, and has. Or alternatively, I don't do it, in which case the dog becomes unadoptable. I'm damned if I do either way. And it's not just me saying so. There were seven veterinarians who walked in, all of whom had that position. They don't have to be right. But the fact is, what New York state law says, you have to trust that veterinarian's independent professional judgment. They can't be forced to do something because someone at New York takes a minority view that spaying and neutering at an early age is a good idea. Unless there's any further questions, Your Honor? Thank you very much for a reserved decision. Thank you.